**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                    )
**ANDREW REINACH,**               )
                                    )
      **Plaintiff,**             )
                                    )     **Civil Action No.**
      **v.**                     )     **07-12337-FDS**
                                    )
**THE HANOVER COMPANY,**   )
                                    )
      **Defendant.**           )
_____)

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a civil action for breach of an employment contract. Jurisdiction is based on diversity of citizenship. The central question presented is whether the written offer of employment made by defendant The Hanover Company, and accepted by plaintiff Andrew Reinach, created a fully integrated agreement.[1]

Reinach originally filed a complaint in Superior Court in Worcester, Massachusetts on November 14, 2007. The four-count complaint includes claims for breach of contract (Count 1); breach of the duty of good faith and fair dealing (Count 2); promissory estoppel (Count 3); and misrepresentation (Count 4). On December 19, 2007, defendant removed the case to federal court on the basis of diversity of citizenship under 28 U.S.C. § 1332(a)(1).

Defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56(c). For the

---

[1] Although it appears to have been doing business as The Hanover Company, defendant contends that the proper party in interest is Hanover R.S. Limited Partnership. (Def. 56.1 Stmt. at 1). Defendant does not, however, suggest that any consequence flows from plaintiff's misidentification. For the sake of convenience, the Court will refer to defendant as Hanover.

reasons stated below, the motion for summary judgment will be granted.

## I.        Background

The facts are presented in the light most favorable to the non-moving party except as otherwise noted.

### A.        Initial Contacts and Pre-Offer Discussions

As of May 2007, Andrew Reinach was a resident of Massachusetts.  Hanover is a Delaware limited partnership based in Houston, Texas, that specializes in developing and constructing high-end, multi-unit apartment buildings across the country.

On May 31, 2007, Reinach met with two representatives of Hanover to discuss employment opportunities:  Mark Wood, a Vice President for Construction, and Tom Denney, a Regional Manager for Construction.  At this meeting, Reinach, Wood, and Denney discussed general matters, such as Hanover's business model, its locations, and plans for future growth.

The next day, Reinach spent the day at Hanover's headquarters meeting with various employees.  The discussions remained general and focused on Hanover's profitability, its growth, and its projects.  No specific position or job responsibilities were discussed that day.

Upon his return to Massachusetts, Reinach engaged in telephone conversations with Wood, during which he expressed an interest in a development position with Hanover.  According to Wood, however, Hanover quickly decided that he was not qualified for such a position. Instead, the company envisioned Reinach serving in a construction management role, overseeing "third-party contracting" projects—projects for which Hanover hires a third-party general contractor rather than handling the general contracting internally.  According to Reinach, he and Wood discussed an opportunity within the third-party contracting division, working on projects in

Chicago, Atlanta, and Fort Lauderdale.[2]

On June 11, Reinach returned to Texas to meet with Wood and Howard Dyer-Smith, Hanover's President of Construction (and Wood's supervisor).  At that point, Wood and Reinach discussed the potential construction management role and the Chicago project in more depth. Wood explained that the Streeterville development in Chicago was projected to cost $200 million, making it the largest project in both size and cost in Hanover's history.  Reinach came away from the meeting with the "impression" that  he would be part of a team managing all three projects starting "right away" upon his joining the company.  (Reinach Dep. at 31).[3]

Wood explained to Reinach the bonus structure for third-party contracting work, which was to be a modified version of Hanover's bonus system for self-performed projects.  Bonus pools were specific to each project, and were paid based on the achievement of various milestones during the course of the project and upon the sale of an asset.  Wood showed Reinach spreadsheets to demonstrate how bonus pools were divided amongst team members on self-performed projects and gave him an idea of how that might carry over to third-party contracting

---

[2] Hanover disputes this.  According to Wood, the Atlanta and Fort Lauderdale developments were discussed in general terms, but the focus of the discussions remained the Chicago project at all times.   Wood did not actually have any responsibility over the Atlanta or Fort Lauderdale projects, which were managed by other vice presidents for construction.  Reinach does not dispute the actual scope of Wood's authority, although he does not believe that he learned this until after he began working for the company.  Wood, however, recalls that Reinach criticized the fact that each site was overseen by a different vice president.  Even according to Reinach, the specifics of his anticipated job responsibilities on the three projects were not discussed.

[3] According to Wood, they only discussed the possibility of establishing an internal specialized group to execute third-party projects, with the understanding that the such a plan would turn on the success of the existing projects in Chicago, Atlanta, and Fort Lauderdale.  Reinach was critical of the existing third-party management structure and expressed concerns that one project would not keep him fully occupied. Wood contends that he told Reinach that he was not responsible for the other projects and that he needed a strong manager in Chicago.  Wood also told him that he did not anticipate that he would be working on any project other than the Chicago project for as long as a year because it would take time for Reinach to acclimate to Hanover's collaborative way of doing business.  Wood further states that he and Reinach never, at any time, discussed the Atlanta and Fort Lauderdale projects—for which Wood was not responsible—in depth.

projects.  The bonus pools on third-party work were to be approximately 40% of those on self-performed work, but would be split between a much smaller team of Hanover employees, because third-party work involved only a core management staff rather than a large construction staff.

According to Reinach, he came away from the discussion with the expectation that he could make between $75,000 and $100,000 in bonuses per year on *each* of the three third-party sites, or between $225,000 and $300,000 total in bonus compensation annually.

That same evening, Reinach met Dyer-Smith for dinner.  Although Reinach does not recall the substance of the discussions,  Dyer-Smith recalls that the discussion was limited to the Chicago project.

### B.      Offer and Acceptance

On June 14, Hanover extended a written job offer to Reinach in the form of a letter from Connally Harper of Hanover's Human Resources department.[4]  The letter, which was drafted by Wood and approved by Dyer-Smith before it was sent to Reinach, stated:

> We are very excited about the prospect of your coming to work for The Hanover Company.  We would like to offer you a position as a Senior Construction Manager working on the Streeterville Highrise in Chicago, IL.  You will report directly to Mark Wood, the Vice President for this project.

Although the Streeterville project was located in Chicago, the new job would require Reinach to relocate to Houston.  The offer letter went on to address Reinach's annual base salary, the bonus program, relocation reimbursement, housing reimbursement, and benefits.  The specified start date was July 11, 2007.

In the letter, Reinach was offered a starting salary of $90,000 that would be bumped up to

---

[4] The letter appears to have been e-mailed to him as an attachment.

$150,000 annually in his second month of employment; the initial rate was set lower to reflect personal time Reinach required between his official start date and his anticipated move date.  As for the bonus program, the offer letter stated:  "Participate in Construction Company Bonus program as discussed (modified Company program (s) for third party executed work)".  The company also agreed to pay pre-approved relocation expenses and for two house-hunting trips for Reinach and his wife, as well as interim housing and travel to and from Boston.

In closing, the offer letter stated:

> I hope this letter helps to clarify your employment opportunity with The Hanover Company.  While we are excited about your coming to work for us, any employment arrangement would be an "at will" arrangement in accordance with the provisions of the Employee Handbook.[5]  If you agree to the terms of this offer, please indicate below by signing and return the original to me.  Should you have any further questions, please feel free to contact Mark Wood or myself.

The letter then provided blank spaces for an "Acknowledgment" and "Date."

Reinach accepted the offer the same day, signing his name to the acknowledgment line and dating the signature June 14, 2007.  It appears that he then faxed the signed copy back to Hanover.

**C.     The Commencement of Employment**

Between June 14 and July 11, Wood forwarded e-mails and other information concerning the Chicago project to Reinach.  Meanwhile, Reinach and his wife traveled to Houston on a house-hunting trip.  They ultimately entered into a purchase contract for a house in Texas, pursuant to which they paid a deposit of $6,000.  The closing was scheduled for August 1, 2007.

On July 11, Reinach began working for Hanover as scheduled.  That same day, he and his

---

[5]  Neither party has submitted a copy of the Employee Handbook.

wife entered into a contract to sell their home in Massachusetts.  The closing on that sale was scheduled for August 17, 2007.

On July 17, Reinach asked Wood when he would begin working on the Atlanta and Fort Lauderdale projects.  According to Reinach, Wood said that he "probably" would not work on those sites, and that he would convey his questions to Dyer-Smith.[6]

That same day, Reinach consulted Dyer-Smith about the scope of his duties.  He asked why he would not be working on the Atlanta and Fort Lauderdale projects and expressed dissatisfaction with his level of responsibility on the Chicago project.  According to Reinach, he "essentially" told Dyer-Smith that Wood had promised him oversight on the Atlanta and Fort Lauderdale projects as well as the Chicago project.  (Reinach Dep. 82).  Dyer-Smith confirmed that Reinach would only be working on the Chicago project, and stated that the Chicago project was Hanover's most ambitious ever and that Reinach would have to go through a learning process.  In addition, Dyer-Smith reminded Reinach that, as opposed to development employees at Hanover, the duties of construction employees are more "hands-on."  Reinach recalls Dyer-Smith telling him that he would have to "walk before [he could] run."

The next day, Reinach and Wood went to Chicago for meetings on the Streeterville project.  Over the course of two days, the two men consulted with architects, structural engineering firms, and a candidate for junior management on the project.  They also toured a nearby high-rise that was under construction.  According to Reinach, the trip gave him a sense for

---

[6] Hanover disputes this.  Wood told Reinach that he would not have any responsibilities on those projects, for which Wood himself had no responsibilities.  According to Wood, he recommended that if Reinach wanted confirmation of his duties, he could speak with Dyer-Smith, who was in charge of Hanover's entire construction division.

the task ahead, showing him that his responsibilities on the Streeterville project were daunting and would be sufficient to keep him busy on a full-time basis.

### D.   Relations Deteriorate

Reinach testified that after the Chicago trip, he accepted that he would not be working on multiple projects simultaneously and would not be involved in managing the construction of the Atlanta and Fort Lauderdale projects.  In a taxi on the way to O'Hare Airport as they were leaving Chicago on July 19, Reinach asked Wood for increased compensation—specifically, an increase in the as-yet-not-finalized bonus pool for the Chicago project.  He also asked for a change in his official job title to more accord with what he says Wood promised him in their pre-contract discussions—specifically, a title without the word "construction" in it.  According to Reinach, it was clear to him that his Streeterville responsibilities would involve more than just managing the construction aspects of the project and he felt that his current title "pigeonholed [him] as a construction guy." (Reinach Dep. 95).

Before they parted ways at the airport, Reinach told Wood that if the company increased the Chicago project bonus pool as requested then he would be happy with his job.  Wood told Reinach that he would discuss it with Dyer-Smith and get back to him.

On July 20, 2007, Wood told Dyer-Smith about the Chicago trip and Reinach's requests concerning his title and the bonus pool.  Wood and Dyer-Smith decided not to change the title or the bonus structure on the Streeterville development.  The next day, Wood e-mailed Dyer-Smith. He suggested that if the company continued to develop its third-party contracting portfolio and hired additional staff for the Chicago site, Reinach could be in a position to take on a second project toward the end of the year or thereafter.

Minutes after his e-mail to Dyer-Smith, Wood e-mailed Reinach.  He reported that he had told Dyer-Smith that Reinach could be in a position to work on a second project "by year end (if the opportunity arises, which I think it could[])"  but that he would wait to "advocate for the title change" until Reinach had actually been assigned a second or third project.  Wood also communicated that the company would not be increasing the anticipated bonus pool for the Chicago project.

On July 25, 2007, Reinach responded to Wood's e-mail and stated that he was "disappointed" with the responses to his requests.  He stressed that his past experience warranted the title change:  "I am certain my career experience supports this. . . .  Hanover is the only company who doesn't view my credentials as worthy enough to warrant a stronger title.  Remember, I'm coming from 8 years of working for developers, not contractors.  That alone should justify unique consideration."

Regarding the bonus, Reinach acknowledged that "the discussions during my interview were hypothetical only (as the program had not yet been established, or so I was [led] to believe)" and now requested details about the "final plan in place."  He wrote that he had never before worked on only one project at a time and that therefore "this will be asking me to take a step backwards in terms of career development."  Finally, he noted as follows:  "Here, I've agreed to uproot my family and move halfway across the country without a plan in place upon signing and my 'blue skies' [are] beginning to cloud over . . . ."

On Friday, July 27, Reinach e-mailed Wood again.  The e-mail stated as follows:

> With respect to the bonus pool, if what we discussed is the final ruling on the matter, then there certainly must be something in writing memorializing the numbers.  My question is somewhat innocent; I just want to run a sample bonus

package for the Chicago project. . . .  I previously worked in development, so there was no reason for me to think this was a construction position.  This quickly disappeared as well as the opportunity to work in development (the real reasons why [are] still unknown to me).  You said I was on the fence between development and construction.  But no serious consideration was ever given for development. . . .  I (think I) am the only one with 3rd party management experience yet I am relegated to extracting paint colors, floor specifications, and finish details from the Hanover architect.  Certainly not a step up the career ladder if you ask me.  This is not the way to showcase my talents. . . .  I hope you can give me some clarity on my job.  I'm looking for a career that's going to challenge me intellectually, not tie me up in internal company politics.  Is this the one?[7]

It appears that Reinach and Wood spoke by telephone several times between July 28 and

July 30, rehashing many of the same issues that had surfaced in the previous weeks.[8]

### E.        Reinach and Hanover Part Ways

On July 28, the day after their telephone conversation, Wood sent Reinach the following

e-mail:

In light of the gravity of this decision for all concerned, I have to know that you are genuinely and authentically excited about the position we are hiring you for, the role today, specifically and exclusively about managing the building [of] a 50 story building in downtown Chicago.

I don't want you to take this project on, unless you are committeed [sic] to being 100% in this game.

---

[7] Wood and Reinach then spoke by telephone.  Reinach does not recall the substance of their conversation.  According to Wood, however, Reinach again expressed frustration with Hanover's refusal to assign him to multiple projects simultaneously and repeated his criticisms of the company's approach to third-party contracting.  Wood replied that Reinach would first have to demonstrate his abilities on the Streeterville project before Hanover would consider offering him additional projects or reorganizing its third-party contracting structure.  Wood also reaffirmed the company's decision not to change Reinach's construction title or restructure the Chicago project bonus pool.

[8] According to Wood, during these conversations he repeated that Reinach had been hired for the Senior Construction Manager position on the Chicago project and that project only.  Wood contends that Reinach attempted to extract a commitment from Wood that he would be given oversight on the Atlanta and Fort Lauderdale projects in the future.  Wood explained that he was not in charge of the other projects and that, in any event, Reinach first needed to prove himself on the Chicago project.

**We will have failed each other if your focus is on what is next instead of what is here and now.**

I would rather find someone else for the job who is totally jazzed about this opportunity, even if it meant they had none of your third party credentials.

As difficult as it may be, I implore you to not let your answer be influenced by the fact that you've sold/bought your homes.  Assume for the sake of discussion only, that if we choose to part ways that we somehow could mitigate that issue.

PLEASE do not start something here that you do not intend on finishing.
. . .
Ask yourself if you would have accepted this position if you would have known everything you now know about Hanover, the people involved, the way to do things etc.

Take a few days if you need to [] think through your response.

(emphasis in original).

Reinach replied to Wood by e-mail the next day.  He wrote:  "If I move to Houston, I have no intention of not finishing what I start and succeeding at what I believe the future holds for me. . . .  I too don't want to risk my, or my family's, livelihood if Hanover is not going to enable me to reach my full potential."  He closed by asking Wood to speak that afternoon to "resolve these issues and move forward."

Wood and Reinach spoke by telephone later that day.  Reinach stated that if he knew during the interview process what he knew now, he would not have come to work for Hanover. He asked Wood for a few more hours to weigh his options, and Wood told him to sleep on it.

When they spoke the next day, now Monday July 30, Reinach asked Wood:  "What would you think if we didn't continue the relationship?"  Wood responded, "I think that's a good idea."[9]

---

[9]  Wood's account is not materially different.  Wood states that Reinach said he thought it best not to continue his employment with Hanover and that he responded that it was probably for the best for both parties to end the relationship and move on.

F.      **Relocation Expenses**

Reinach testified that toward the end of the July 30 call, he told Wood that he needed to "make a bunch of phone calls and cancel all these housing contracts."  Wood asked Reinach what he thought his exposure would be to cancel the purchase of the Texas house and the sale of the Massachusetts house.  Reinach said he would lose his $6,000 deposit, plus some additional expenses on the Texas transaction, but that with respect to the Massachusetts house he had been told that he could probably get out of the contract without too much difficulty.

That same day, Reinach notified the counter-parties in the two transactions that he would not close on either.  Apparently, they were not as accommodating as Reinach believed they would be.  On August 1, Reinach e-mailed Wood a list of his expenses; the total came to $160,362.

Wood responded on August 2.  He wrote that he was "in shock at these numbers" because he "was thinking [Reinach's] exposure would be a small fraction" of the figure quoted.  Wood said that he had forwarded Reinach's e-mail to Hanover's  human resources department for review and advice.  On August 8, Hanover offered Reinach $25,000 to help defray relocation-related expenses.  According to Thomas, Hanover made this offer as a gesture of good will and not out of any sense of legal obligation.[10]  Reinach rejected the offer and did not make a counter-offer.  He has testified that he was "insulted" by the offer.[11]

Reinach ultimately settled with the Texas sellers and the Massachusetts buyers for $46,000 and $50,000, respectively.  Hanover had no input into Reinach's decisions to enter these

---

[10]  Hanover contends that as an offer of compromise, the $25,000 offer is not admissible to prove the Company's liability under F.R.E. 408.

[11]  It is not clear from the complaint or his opposition memorandum, but it appears that Reinach seeks to recover these relocation costs as damages under his reliance-based theories of recovery.

settlements or their terms.

### G.    Subsequent Developments

The current recession has hit Hanover hard.  In September and October 2008 alone, more

than 75 of Hanover's 540 employees separated from the firm, either voluntarily or involuntarily.

The Streeterville high-rise project, on which Reinach was briefly the Senior Construction

Manager, has been indefinitely shelved.  The Fort Lauderdale and Atlanta projects have been

abandoned altogether; the company never broke ground on either site.  There are currently no

Hanover employees assigned to any of the three projects.  All employees who had been assigned

to the Chicago development have either been laid off or reassigned to ongoing projects.

According to Dyer-Smith, once those existing projects are completed, those employees will be

laid off, as well, if there are no new projects in the pipeline by that time.  As of the fall, Hanover

had no third-party contracting projects in progress or in pre-development.  If Reinach had stayed

with Hanover, Dyer-Smith says he, too, would most likely have been laid off.

## II.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Essentially,

Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st

Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making this

determination, the Court views "the record in the light most favorable to the nonmovant, drawing

reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

## III.   Analysis

For the reasons stated below, defendant is entitled to summary judgment as to each of the four counts of the complaint.[12]  The Court will take up each claim in turn.[13]

### A.   Breach of Contract

Plaintiff alleges that Hanover breached its employment contract with him by limiting his job responsibilities to the Streeterville project in Chicago.  His claim is based largely on alleged oral representations made prior to his acceptance of Hanover's written offer.

Defendant contends that the breach of contract claim fails because the offer letter is an integrated document that limits plaintiff's duties to the Chicago project, and therefore the parol evidence rule bars consideration of any alleged verbal representations that conflict with or supplement the terms of the offer letter.[14]  According to plaintiff, his anticipated responsibilities on the Atlanta and Fort Lauderdale developments were the subject of prior and contemporaneous promises and assurances by Wood that "clarify, amplify and explain ambiguities in the offer letter, and which do not contradict it."  (Pl. Opp. at 9).

The central issue is therefore whether the June 14 offer letter, which plaintiff accepted,

---

[12]  Although the complaint recites four distinct counts, plaintiff only really advances two theories of recovery, predicated on his expectation and reliance interests.  As framed by plaintiff, there is no meaningful difference between the claims for breach of contract and the claims for breach of the implied covenant of good faith and fair dealing.  Similarly, the promissory estoppel and misrepresentation claims overlap substantially.

[13]  The parties appear to agree that Massachusetts law controls.

[14]  Defendant also contends that (1) any alleged promises made to Reinach during the course of his negotiations with defendant were too indefinite to establish an enforceable contract, and (2) impossibility precludes enforcement of the alleged promises.  The Court does not reach either argument, as it finds for defendant on the parol evidence issue.

constitutes a fully integrated agreement.  Contract interpretation questions, under Massachusetts

law, are ordinarily questions of law for a court.  *Nadherny v. Roseland Prop. Co.*, 390 F.3d 44,

48 (1st Cir. 2004); *see also Allstate Ins. Co. v. Bearce*, 412 Mass. 442, 447 (1992).  "An

integrated agreement is a writing that constitutes a final expression of one or more terms of an

agreement."  *Coll*, 50 F.3d at 1123.  "Whether there is an integrated agreement is to be

determined by the court as a question preliminary to determination of a question of interpretation

or to application of the parol evidence rule."  Restatement (Second) of Contracts § 209(2).  In

Massachusetts, "the parol evidence rule precludes evidence of earlier or contemporaneous

discussions that would modify the provisions of a later integrated agreement which the proponent

of the agreement seeks to enforce." *Bank v. IBM*, 145 F.3d 420, 424 (1st Cir. 1998) (quoting

*New England Fin. Res., Inc. v. Coulouras*, 30 Mass. App. Ct. 140, 145 (1991)).  Therefore, if the

Court concludes that the offer letter is fully integrated, evidence of the alleged pre-contract

assurances would be inadmissible absent ambiguous language in the offer letter itself.

Plaintiff further contends that summary judgment is precluded because of ambiguities in

the offer letter concerning both the description of his position and the compensation he was to

receive.  Contracts can be fully integrated (or ambiguous) with respect to some terms and not as

to others.  *See* Restatement (Second) of Contracts § 210.  The Court will therefore take up each

issue separately.

### 1.    <u>Job Description</u>

#### a.    <u>Integration</u>

The first question is whether the contract is integrated as to the job description.  The offer

letter states:  "We would like to offer you a position as a Senior Construction Manager working

14

on the Streeterville Highrise in Chicago, IL.  You will report directly to Mark Wood, the Vice President for this project."  Plaintiff accepted that offer in that form.  Accordingly, those statements constitute a final expression of the terms agreed to by the parties concerning the location where plaintiff was to work (Chicago), the specific project on which he was to work (Streeterville), his job title (Senior Construction Manager), and his reporting relationship (to Mark Wood).  Indeed, the extrinsic evidence is fully consistent with that conclusion; everything that transpired prior to the issuance of the formal offer were normal business discussions and negotiations that did not result in any kind of verbal agreements, much less an inconsistent agreement.  The contract is therefore fully integrated with respect to the location of the position and plaintiff's general responsibilities.

Plaintiff attempts to vary this term of the contract, in effect, to make the contract read that Hanover "would like to offer you a position as a Senior Construction Manager working on the Streeterville Highrise in Chicago, IL, *and third-party projects in Atlanta and Fort Lauderdale*."  Such a modification of an integrated agreement is exactly what the parol evidence rule prohibits.[15]

### b.    Ambiguity

Plaintiff further contends that even if the agreement is integrated as to the job description, it is nonetheless ambiguous, because the Atlanta and Fort Lauderdale projects are not mentioned.  But plaintiff is not pointing to ambiguous terms, and attempting to explain them; he is trying to

---

[15] Plaintiff has not produced any evidence that his specific duties (as opposed to his general duties and the geographic scope of those duties) were the subject of prior or contemporaneous verbal agreements or even representations by Wood.  In any event, because the offer letter is fully integrated with respect to *where* he would be performing his duties, it is only the Chicago duties that would matter, and even an omission or ambiguity as to his Chicago duties could not *create* job duties for plaintiff in Atlanta and Fort Lauderdale.

*add* terms that are not there.[16]  "'Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.'"  *Coffin v. Bowater, Inc.*, 501 F.3d 80, 98 (1st Cir. 2007) (discussing latent ambiguities) (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993)).  Again, because the contract is both fully integrated and unambiguous with regard to the specific site for which plaintiff would be acting as senior construction manager, evidence of prior or contemporaneous promises concerning other sites is barred by the parol evidence rule.  *See Lawrence v. Providence College*, 1994 U.S. App. LEXIS 33637 (1st Cir. July 13, 1994).

### 2.   **Compensation**

Plaintiff next contends that ambiguities in the language concerning the bonus program require denial of summary judgment.  Specifically, plaintiff contends that, "By using the words 'program(s)'[] and 'as discussed' patent ambiguity is clear.  Participation and compensation amounts obviously depend on the number of 'programs' which plaintiff would manage."  (Pl. Opp. at 10).

The use of the term "program(s)" does not, as plaintiff contends, create an ambiguity requiring the resolution of competing meanings.  Ordinarily, ambiguities in contract language present questions of fact for the jury.  *See Coll*, 50 F.3d at 1122.  However, "if, despite the ambiguity, no reasonable person could interpret the contract as one party does, the court may

---

[16]  Plaintiff contends that he "was told that planning and design on the other two projects was lagging behind Chicago, that his initial duties would be Chicago, and that he would be working on Atlanta and Fort Lauderdale during year 2007 as planning and design of those projects concluded and construction was to begin." (Pl. Opp. at 10).  As a factual matter, this assertion is not supported by the evidence, and is in fact contradicted by plaintiff's own deposition testimony; he testified that he had the "impression" that he would be involved in all three projects "right away."  (Reinach Dep. 31).  His conduct upon arriving at Hanover also contradicts this assertion, as he began asking about his Atlanta and Fort Lauderdale duties within one week of starting work.

enter judgment against that party." *Nadherny*, 390 F.3d at 48-49.[17]   Here, no reasonable person

would conclude that the language suggesting that plaintiff might participate in more than one

bonus "program" means that he was promised work on, and receive bonuses from, the Atlanta

and Fort Lauderdale projects.

First, "it is a familiar precept of contract interpretation that the specific controls the

general." *Lawson v. FDIC*, 3 F.3d 11, 17 (1st Cir. 1993).   It would be unreasonable to conclude

that the use of the term "program(s)" in a general provision concerning the company's bonus

program was intended to govern the far more specific provision concerning the project for which

plaintiff was hired.  Indeed, plaintiff's construction would require the factfinder to disregard

entirely the specific and unambiguous language concerning the Chicago project in order to

conclude (because the term "program(s)" was added on one of three references to bonus

compensation) that the contract is ambiguous as to *which project* plaintiff was being hired to

oversee.  "'If the apparent inconsistency is between a clause that is general and broadly inclusive

in character and one that is more limited and specific in its coverage, the latter should generally be

held to operate as a modification and pro tanto nullification of the former.'"  *Lembo v. Waters*, 1

Mass. App. Ct. 227, 233 (1973) (quoting Corbin on Contracts § 547).  The highly specific offer

of "a position as a Senior Construction Manager working on the Streeterville Highrise in Chicago,

IL" necessarily controls the general bonus program language.

Second, "all of the contract's terms should be construed together to find a coherent

---

[17]  Moreover, as discussed more fully below, the relevant extrinsic evidence here is not in dispute. "[T]here is some suggestion in Massachusetts law that if the extrinsic facts are not in dispute, a judge should decide the issue even if the outcome may be debatable."  *Nadherny*, 390 F.3d at 49 (citing *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 303 (1st Cir. 2001); *Atwood v. City of Boston*, 310 Mass. 70 (1941)).

whole." *Nadherny*, 390 F.3d at 49 (citations omitted).  Accordingly, a court may look to related

provisions of a contract "to cast light on the meaning of disputed language." *Id.*  There is an

obvious, eminently reasonable interpretation of the contract as a whole that removes any

ambiguity from the use of the term "program(s)"—that is, that plaintiff will participate in any

bonus program *or programs* that are related to the Chicago development.[18]

Evidence from plaintiff himself supports this reading, fully explaining any ambiguity

caused by the term "program(s)" without reference to the Atlanta or Fort Lauderdale projects.

As plaintiff testified, each project essentially had two bonus programs associated with it:  "If I

recall correctly, it was that the bonus pool for third-party work would be approximately 40

percent of the bonus pool for self-performed work [with payouts based on milestones reached

during the course of the project].  *There was also a bonus participation based on the sale of an

asset at the end of a project that would likewise be modified for third-party work.*"  (Reinach

Dep. 34-35) (emphasis added).  "Even when extrinsic evidence is considered, a judge may

conclude that the evidence is 'so one-sided that no reasonable person could decide the contrary.'"

*Nadherny*, 390 F.3d at 49 (quoting *Boston Five Cents Sav. Bank v. Sec'y of Dept. of Hous. and

Urban Dev.*, 768 F.2d 5, 8 (1st Cir. 1985)).  By his own testimony, plaintiff has demonstrated the

---

[18]   According to plaintiff, the bonus program had still not been finalized even after he began working, and negotiations regarding bonus were apparently ongoing as far as he was concerned.  *See* Reinach Dep. 93 ("[In the taxicab on the way to O'Hare] I asked for a change in title and for the bonus plan that was discussed, *but not finalized*, to be modified yet again.") (emphasis added).  However, even if the contract (as embodied in the offer letter) was not fully integrated as to the structure of the bonus program(s), there is no ambiguity that plaintiff was only being offered a position on the Chicago project.  Accordingly, his bonus compensation would come only from the Chicago pool, regardless of what specific formula the company ultimately utilized to calculate his bonus compensation *on that project*.

most plausible meaning of the disputed term.[19]

Given that this construction makes sense of the contract as a whole, and is confirmed by undisputed extrinsic evidence from both parties, the Court is satisfied that the use of the term "program(s)" was intended to refer to multiple bonus programs available on the Chicago development.  Summary judgment will therefore be granted to defendant on Count 1.

### B.   Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges that Hanover breached the implied covenant of good faith and fair dealing, "which duty includes, among other things, the duty to perform as agreed and not to deprive plaintiff of his bargained for rights under the contract."  (Compl. ¶ 26).  Plaintiff contends that "Defendant unilaterally and materially changed plaintiff's job duties and compensation structure after he began employment. . . .  Plaintiff was promised multiple projects and high compensation. It is grossly unfair of defendant to deny plaintiff those opportunities after he relocated to Texas solely because Mr. Wood did not know that his boss had made promises to other individuals on Atlanta and Fort Lauderdale."  (Pl. Opp. at 13).[20]

Massachusetts law implies a covenant of good faith and fair dealing in every contract. *Nadherny*, 390 F.3d at 52 (citing *Starr v. Fordham*, 420 Mass. 178 (1995)).  Plaintiff, however, was an at-will employee.  As plaintiff himself points out, the implied covenant of good faith and fair dealing has been limited in Massachusetts to cases where an employer terminates an employee

---

[19] Wood's second affidavit confirms this reading.  Wood states that in addition to explaining the milestone and sale components of Hanover's bonus compensation, he also provided plaintiff with bonus program documents, one containing a description of the "Construction Performance Based Bonus Program" and the other outlining the "2% Project Sale Incentive Program."  (Supp. Wood. Aff. ¶¶ 2, 3, Ex. 1).

[20] Framed this way, it is not clear that plaintiff's second count differs from his first.

to deprive him of a benefit, such as an earned commission, to which he is entitled.  (Pl. Opp. at

13); *see Coll*, 50 F.3d at 1125 (citing *Fortune v. National Cash Register, Inc.*, 373 Mass. 96

(1977)).

Plaintiff's claim indisputably falls outside the scope of the protection of the implied

covenant in employment actions in Massachusetts.  Plaintiff, presumably recognizing this, asks the

Court "to extend this covenant to situations, such as in this case." (Pl. Opp. at 13).  If there is in

fact a need to expand the coverage of the doctrine—a point as to which the Court expresses no

opinion—this is certainly not the case.

In appealing to the "unfairness" of denying him the highly remunerative opportunities he

was allegedly promised, plaintiff's invocation of the implied covenant here overlaps substantially

not only with his breach of contract action but also with his reliance-based theories of recovery.

Defendant's conduct therefore appears more than adequately covered by existing causes of action

without extending the scope of the implied covenant.  Because plaintiff's termination—to the

extent his apparently mutual separation from Hanover can even reasonably be characterized as a

termination—did not deprive him of any "earned commission or similar compensation due for past

services,"summary judgment will be granted as to Count 2.  *Coll*, 50 F.3d at 1125.

**C.    Promissory Estoppel**

In Count 3, plaintiff alleges that "Defendant knew or should reasonably have expected that

its promises to plaintiff would induce plaintiff to accept employment and relocate himself and his

family to Texas from Massachusetts." (Compl. ¶ 30).  Aside from a lone conclusory paragraph in

his opposition, plaintiff does not develop this theory of recovery any further.[21]  In any event, the claim cannot succeed.

"Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent and when enforcing the promise would serve the interests of justice."  *Steinke v. Sungard Fin. Sys.*, 121 F.3d 763, 776 (1st Cir. 1997); *see also Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995) ("[A promissory estoppel] action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration.").[22] Because the parties did, in fact, execute a contract for consideration governing the subject matter of plaintiff's relocation, the claim is inappropriate in this context.

The claim, in any event, also fails for lack of evidentiary support.  "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation."  *Rhode Island Hosp.*, 419 Mass. at 848 (internal quotation and citation omitted).  Although reasonable reliance is ordinarily a question for the jury, the Court may dismiss such a claim if the facts alleged in the complaint preclude a finding of reasonable reliance.  *See, e.g.*, *Rodi v. Southern New Eng. Sch. of Law*, 389 F.3d 5, 16 (1st Cir. 2004); *Cooprider v. John Hancock Mut. Life Ins. Co.*, 1993 U.S.

---

[21]  The opposition also includes a section entitled "Misrepresentation and Detrimental Reliance," which may be intended to cover both Count 3 and Count 4.  As noted above, the two claims overlap substantially. Arguments contained in that section will be considered here to the extent they also apply to the promissory estoppel claim.

[22]  "An offspring of the intermarriage of tort and contract, this doctrine holds that a promise given without consideration is binding when the promissor should reasonably expect to induce action or forbearance if injustice can be avoided only by enforcement of the promise."  *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 31 (1st Cir. 1988) (explaining doctrine of promissory estoppel).

App. LEXIS 24979, at *8 (1st Cir. Sept. 29, 1993) (concluding that plaintiff's alleged reliance on an agreement executed by someone known to lack authority to bind the defendant was "unreasonable as a matter of law" and affirming summary judgment); *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988) ("When a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law."). This is one of those cases.

Any reliance by plaintiff on pre-contract promises or assurances was unreasonable as a matter of law. "Where a written statement conflicts with a prior oral representation, reliance on the oral representation is generally held to be unreasonable." *Coll*, 50 F.3d at 1124 (agreeing with the district court that plaintiff "could not have reasonably relied on [pre-hire discussions]" and affirming summary judgment on promissory estoppel and misrepresentation). Here, plaintiff seeks to rely on prior oral promises regarding "certain employment opportunities and compensation levels based on his expected performance in multiple construction projects, not just one." (Pl. Opp. at 14). But the subsequent written offer letter promises him only a single construction project, the Streeterville development. As the First Circuit has explained:

> Confronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying. A reasonable person does not gamble with the law of the excluded middle, he suspends judgment until further evidence is obtained. Explicit conflict engenders doubt, and to rely on a statement the veracity of which one should doubt is unreasonable. The law does not supply epistemological insurance. Nor does it countenance reliance on one of a pair of contradictories simply because it facilitates the achievement of one's goal.

*Trifiro*, 845 F.2d at 33-34 (quoting Restatement (Second) Torts § 548). Plaintiff testified that it struck him that his responsibilities with regard to the Atlanta and Fort Lauderdale projects, which were material terms in his view, were not mentioned in the offer letter, but that he does not recall

following up with anyone at Hanover about the omission.  He said it did not concern him because

Wood had told him those terms verbally.  (Reinach Dep. 55).  This was not reasonable under the

circumstances.  *See Hall v. Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 94 (1987)

("Inchoate negotiations are no better basis for reliance than for an action on the purported

contract as such.").

The reasonableness of plaintiff's reliance on any verbal representations in making the

decision to relocate to Texas is also called into question by the at-will nature of his employment.

"Employment at will is terminable by either the employee or the employer without notice, for

almost any reason or for no reason at all."  *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403

Mass. 8, 9 (1988).  With limited exceptions, Hanover could have terminated plaintiff at any time.

Thus, even crediting plaintiff's factual predicate, he cannot maintain that he reasonably relied on

promises of additional work and compensation in making the decision to move to Texas—and

seek damages when some of the work and compensation were taken off the table—when Hanover

was free to discontinue the relationship, as it extended to *all* work and *all* compensation, at any

time.  Summary judgment will therefore be granted as to Count 3.

### D.    Misrepresentation

Finally, Count 4 alleges that Hanover's promise to employ plaintiff on multiple building

projects constitutes a false representation of a material fact, forming the basis for a

misrepresentation claim.  (Compl. ¶ 34).  There is some confusion about whether plaintiff is

proceeding under a theory of negligent or intentional misrepresentation, but that question need

not detain the Court, as plaintiff cannot prevail under either theory.  Reasonable reliance is an

essential element of any misrepresentation claim, intentional or negligent.  *See Robertson v.*

*Gaston Snow & Ely Bartlett*, 404 Mass. 515, 523 (1989).  As discussed above, Reinach's reliance

was unreasonable as a matter of law. "Promissory estoppel as well as deceit, [and] negligent

misrepresentation . . . [all] require reasonable reliance. . . .  Accordingly, if petitioner's reliance is

found unreasonable under the circumstances, all of these claims must fail."  *Trifiro*, 845 F.2d at

33.  Thus plaintiff's misrepresentation claim, whatever the variety, fails for the same reason as his

promissory estoppel claim.  *See Coll*, 50 F.3d at 1125 n.6 (noting that plaintiff's "claim for deceit

also fails because, like promissory estoppel, it requires that the plaintiff demonstrate reasonable

reliance") (citing *Trifiro*); *Trifiro*, 845 F.2d at 34 ("Moreover, because petitioner's other claims

also require that his reliance be reasonable, his claims for deceit [and] negligent misrepresentation

. . . must also fail.").

## IV.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**


                                                      /s/ F. Dennis Saylor
                                                      F. Dennis Saylor IV
                                                      United States District Judge

Dated: September 18, 2009